BERZON, Circuit Judge,
concurring in part and dissenting in part:
I agree with the government that the National Oceanic and Atmospheric Administration’s National Marine Fisheries Service’s (“NMFS”) “current conditions” methodology was reasonable and is entitled to deference. I therefore concur in the majority disposition with the following exception:
I agree with the petitioners that NMFS acted arbitrarily and capriciously when it approved the planned exploitation rates for the Georgia Strait Region. In approving the Georgia Strait Region exploitation rate, the agency ignored the results of the methodology it otherwise vigorously defends and approved a harvesting rate inconsistent with its own analysis. Moreover, the reasons the agency provided for departing from its chosen analytic framework are speculative and not supported by evidence in the record or by a quantitative analysis. For these reasons, I would hold the agency’s conclusion with respect to the Georgia Strait region arbitrary and capricious.
More specifically, the agency approved an exploitation rate for Nooksack salmon that is not only not “at or below” the benchmark rebuilding exploitation rate (“RER”), but is, in fact, more than twice as high than its derived rate. Further, when discussing the Nooksack River salmon population, the agency noted that, “Trends in escapement of natural-origin Nooksack early chinook salmon populations are increasing.” By the agency’s *340 own reasoning, then, Nooksack River salmon production and viability are not primarily constrained by habitat conditions and do benefit from reduced harvesting. Yet, the agency reached the opposite conclusion, stating that “natural-origin recruitment [for Nooksack River salmon] will not increase much beyond [current] level[s] unless constraints limiting marine, freshwater, and estuary survival are alleviated.”
The NMFS attempted to justify its departure from its own methodology by arguing that other factors will “adequately protect chinook salmon populations in the Georgia Straight Region.” Contrary to the majority’s conclusion, the justifications offered are not reasonable.
First, even if contributions from hatchery-origin spawners will “buffer” the adverse effects of the high exploitation rates, this justification cannot be squared with NMFS’s repeated emphasis on maintaining the viability of the natural salmon population in each region. Second, the agency’s argument that increasing natural-origin escapement trends justified a departure from its chosen methodology is at odds with its previous conclusion that the absence of increasing natural-origin escapement among other populations justified higher exploitation rates. The agency cannot rationally argue that both the absence and the presence of increasing natural-origin escapement justify higher harvesting rates. Third, the agency’s suggestion that the Indian “tribes’ expertise regarding the conservation of trust resources” will adequately protect the No-oksack River salmon is vague and could be used to justify a departure from the agency’s chosen methodology across-the-board.
Fourth, and perhaps most importantly, the agency provides no quantitative support for the proposition that these other factors will compensate for the dangers posed by the high exploitation rates. This absence of quantitative analysis is particularly striking in light of the fact that the agency used complex data analysis techniques to derive the RERs and did not rely simply on speculation.
In sum, the reasons provided by NMFS for departing from its chosen methodology when it approved the proposed exploitation rates for the Georgia Strait region are both speculative and inconsistent with other aspects of the agency’s approach to evaluating the harvest management plan. They do not justify the agency’s decision to ignore the results of its own analysis. See Motor Vehicle Mfrs. Ass’n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (stating that an agency acts arbitrarily and capriciously when it “offer[s] an explanation for its decision that runs counter to the evidence before the agency.”).
The majority suggests that the agency could reasonably approve exploitation rates for the Georgia Strait region that endangered the Nooksack River population so long as the heightened risk to the Nooksack River population did not threaten the viability of the Puget Sound chinook ESU as a whole. But the agency did not rely on this rationale when it approved the proposed Georgia Strait exploitation rates. Rather, under the agency’s guidelines, the viability of the Nooksack River population is integral to an ESU-wide recovery. A reviewing court “must judge the propriety of [an agency] action solely by the grounds invoked by the agency” at the time the action was taken. See SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).
Finally, the agency’s consideration of federal trust responsibilities to treaty tribes does not support, as the majority maintains, the agency’s decision to depart *341 from its chosen methodology and thereby endanger the Nooksack River Salmon population. To the contrary, the agency was required to consider its trust responsibilities when developing the methodology in the first instance. If NMFS’s chosen methodology had failed to account for its trust responsibilities, the methodology itself would have been fatally flawed.
For all of the above reasons, I would hold that the agency acted arbitrarily and capriciously when it approved the Georgia Strait exploitation rate.